UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TIMOTHY GENS,

        Plaintiff,

v.

AMERIMADE TECHNOLOGY INC., et al.,

        Defendants.

Case No.  15-cv-01425-JCS

**REPORT & RECOMMENDATIONS RE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT BY COURT**

Re: Dkt. No. 18

## I.     INTRODUCTION

     In this action, Plaintiff Timothy Gens asserts claims for patent infringement, misappropriation of trade secrets and conversion against Defendants Amerimade Technology Inc. ("Amerimade"), Uptime Semiconductor Equipment Services, Inc. ("Uptime") and Todd Thomas. Default has been entered by the Clerk pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.  *See* Docket No. 10.  Presently before the Court is Plaintiff's Application for Default Judgment by Court ("Motion").  A hearing on the Motion was held on Friday, November 20, 2015.  On February 19, 2016, Plaintiff filed supplemental materials in support of the Motion and the Court held an additional hearing on March 18, 2016 to obtain clarification as to certain aspects of his supplemental materials. Plaintiff has consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) but Defendants have not appeared or consented to magistrate jurisdiction.  Accordingly, this case will be transferred to a district court judge with the following Report and Recommendations.  For the reasons stated below, the Court recommends that the Motion be GRANTED in PART and DENIED in part.

United States District Court
Northern District of California

## II.     BACKGROUND

### A.     The First Amended Complaint

The operative complaint for the purposes of the instant Motion is the First Amended Complaint ("FAC").[1]  Plaintiff's allegations in the FAC are summarized below.

Plaintiff alleges that Amerimade and Uptime are incorporated in the State of California with the same principal place of business, in Livermore California, and that Todd Thomas is a resident of Livermore.  FAC ¶¶ 1-2. He further alleges that Thomas "is the sole shareholder in the Defendants Amerimade and Uptime" and that he "regularly removed cash and other assets from Amerimade to minimize the ability of creditors to attach funds."  FAC ¶ 13.  Similarly, Plaintiff alleges that Thomas "regularly diverted funds owed to Defendant Amerimade to Defendant Uptime to minimize the ability of creditors to attach funds."  *Id*.  According to Gens, Thomas "failed to keep corporate minutes and/or backdated such minutes for Defendants Amerimade and Uptime."  *Id*.  In addition, Plaintiff alleges that Thomas "failed to contribute capital and file pertinent corporate data with state and federal authorities for Defendants Amerimade and Uptime."  *Id*.  On the basis of these allegations, Plaintiff alleges that "Defendants Amerimade, Uptime, and Thomas are alter egos and have such unity of interest that to consider these Defendants to be separate entities would result in injustice."  *Id*.

In his First Cause of Action, for Patent Infringement, Plaintiff alleges that he is the owner of  United States Patent No. 7,181,863 ("the '863 Patent"), entitled "Wafer Dryer And Method Of Drying A Wafer," issued by the U.S. Patent and Trademark Office on February 27, 2007.  *Id*. ¶ 9.  According to Plaintiff, Defendants have been and/or are infringing claims 1 and 4 of the '863 Patent by "making, using, offering to sell or selling in the United States . . . the semiconductor fabrication tool manufactured in the facility occupied by Defendants Amerimade, Uptime, and Thomas in Livermore CA and now operating in a facility occupied by SRI Inc. in Princeton NJ."  *Id*. ¶ 10.  Plaintiff further alleges that Amerimade and Thomas "had access to confidential

---

[1] The factual allegations, claims and defendants named in the FAC are the same as in the original Complaint.  In the FAC, however, Plaintiff's Prayer for Relief is more detailed and sets forth the specific amounts Plaintiff seeks in damages as to each claim.

1    information about the '863 Patent through a Non-Disclosure Agreement and a License

2    Agreement," that the License Agreement was terminated "years ago," and that "[a]fter termination

3    of the License Agreement, Defendants willfully and wantonly built and purchased the

4    semiconductor fabrication tool now in Princeton NJ." *Id*. ¶ 11.  According to Plaintiff,

5    "Defendants then willfully and wantonly concealed from Plaintiff the building and purchase of the

6    semiconductor fabrication tool now in Princeton NJ." *Id*.

7          In his Second Cause of Action, for Misappropriation of Trade Secrets, Plaintiff alleges that

8    he was "in possession of trade secret information as defined by California Uniform Trade Secrets

9    Act . . .Civil Code section 3426.1(d)" and that the "proprietary technical, business, and customer

10   information of Plaintiff that Defendants Amerimade and Thomas had access to constitutes trade

11   secrets information because Plaintiff . . . derives independent economic value from that

12   information, such information is not generally known nor readily ascertainable by proper means

13   by other persons who can obtain economic value from its disclosure or use, and because the

14   information is the subject of reasonable efforts to maintain its secrecy." *Id*. ¶ 15.  Plaintiff further

15   alleges that his trade secret information "was not generally known to Plaintiff's competitors in the

16   industry." *Id*.

17         Plaintiff alleges that Defendants had access to Plaintiff's trade secrets through a

18   nondisclosure and license agreement. *Id*. ¶ 15.   According to Plaintiff, under this agreement,

19   "Amerimade and Thomas were to hold the trade secrets and confidential information in

20   confidence and return all copies of the information documents upon termination of the License

21   Agreement." *Id*.  Plaintiff further alleges that Amerimade and Thomas "have actually

22   misappropriated by selling and transferring the trade secret and confidential information to at least

23   SRI International and Kinetic System Inc.," and also to "another company," and that Defendants

24   "continue[ ] to threaten to misappropriate Plaintiff's trade secrets in violation of CUTSA" *Id*. ¶¶

25   16-17.   Plaintiff alleges that Defendants have "failed to return electronic copies of the [trade

26   secret and confidential] information" despite Plaintiff's demand and have "failed to provide an

27   affidavit stating that all information documents and files had been retuned and all copies destroyed

28   as required by the Agreements." *Id*. ¶ 18.  Plaintiff alleges that Defendants' actual and threatened

misappropriation of his trade secrets has been "willful and malicious in light of their deliberate violation of contractual violations." *Id*. ¶ 22.

In his Third Cause of Action, for Conversion, Plaintiff alleges that under the nondisclosure and license agreement, "semiconductor parts were supplied to the Defendants for the purposes of demonstration only and not for resale." *Id.* ¶ 24. According to Plaintiff, under the agreement Thomas and Amerimade were "required to return the demonstration semiconductor but failed to do so." *Id*. "To add insult to injury," Plaintiff alleges, "Defendants Amerimade and Thomas then used the demonstration semiconductor parts to build and sell the semiconductor tool purchased by SRI Inc." *Id*.

In the Prayer for Relief, Plaintiff seeks several forms of relief on each cause of action. As to the Patent Infringement Cause of Action, Plaintiff requests: 1) a declaratory judgment that Defendants have infringed the '863 Patent; 2) compensatory damages not less than a reasonable royalty of $40,000 and costs of $2,500; 3) treble damages no less than $120,000 and prejudgment interest under 35 U.S.C. § 284 based on Defendants' willful infringement; 4) an award of attorneys' fees and costs of at least $10,000 on the basis that the case is exceptional under 35 U.S.C. §§ 284 and 285; and 5) an order enjoining further acts of infringement.

On the Second Cause of Action, for Misappropriation of Trade Secrets, Plaintiff seeks: 1) $1,100,000 in compensatory damages; 2) injunctive relief enjoining Defendants from using Plaintiff's trade secrets and requiring them to return all documents memorializing those trade secrets, "including but not limited to, engineering drawings, plumbing schematics, bill of materials, electrical schematics, source code, and manufacturing know-how;" 3) punitive damages, along with interest and costs, of at least $500,000; and 4) special damages of at least $7500.

On the Third Cause of Action, for Conversion, Plaintiff seeks $1,100,000 in compensatory damages.

**B.     The '863 Patent**

**1.  Ownership of Rights**

The '863 Patent was issued on February 7, 2007 and the Assignee is listed as SEZ

United States District Court
Northern District of California

United States District Court
Northern District of California

America, Inc. According to the Patent & Trademark Office website, SEZ America, Inc. assigned

ownership to SEZ AG on April 10, 2007.[2] Gary W. Ferrell and Jagjit S. Ratra are listed as

inventors on the '863 Patent, but in a prior state court action, Gens sued Ferrell and SEZ America,

Inc., alleging that he had invented the technology claimed in the '863 Patent.  *See Gens Supp.*

*Decl.*, Ex. E (Expert Report of Daniel E. Ingerman in *Timothy Gens v. Gary Ferrell* ("Ingerman

Expert Report")).[3]  Apparently, Gens was represented in that action by the law firm of Hopkins &

Carley ("H&C").  *See Hopkins & Carley v. Gens*, 200 Cal. App. 4th 1401, 1406 (2011).  Although

the details of the state court action against Ferrell and SEZ America, Inc. are unclear, the docket

sheet reflects that the parties stipulated to a dismissal of the action without prejudice in August

2007.

A Patent Assignment and License Back agreement between Gens and SEZ AG, which took

effect on April 7, 2008, indicates that Gens's claims against SEZ America, Inc. were settled and

that as part of that settlement, SEZ America, Inc. and SEZ Holding Ltd. (described as "the parent

company" of SEZ AG) agreed that ownership of the '863 Patent would be transferred to Gens.

*See Gens Supp. Decl.*, Ex. A (Patent Assignment and License Back).  However, Gens's rights

under the Patent Assignment and License Back agreement were subject to a "lien in favor of

Hopkins & Carley, a law corporation ('H&C'), until such time as Gens pays H&C the amount of

$125,911.85 exclusive of interest at the legal rate on the upaid balance of the judgment from June

5, 2007 until paid, at which time the lien will be discharged without further action from Gens."

Gens Supp. Decl., Ex. A ).   The "judgment from June 5, 2007" referenced in the Patent

Assignment and License Back agreement appears to refer to an order confirming an arbitration

award in favor of H&C.  *See Hopkins & Carley v. Gens*, 200 Cal. App. 4th 1401, 1407 (2011)

("Meanwhile, on June 5, 2007, the trial court granted H & C's petition to confirm the award, and

---

[2] The Court takes judicial notice of the information on the United States Patent & Trademark
Office ("PTO") website on the basis that it is a matter of public record.  *See Bhasin v. Pathak*, No.
EDCV 13-00293-VAP, 2013 WL 1871508, at *2 (C.D. Cal. May 3, 2013) (taking judicial notice
of trademark registration listed on official website of PTO).  .
[3] The Ingerman Expert Report is attached to the Gens Supplemental Declaration, which describes
it as "the expert's valuation report" from "an earlier misappropriation of the same technology of
[a] SEZ employee"  The Court does not have complete information about that case.

entered a judgment for H & C").  That order was entered in separate litigation (also in California

state court) in which Gens's former counsel, H&C, was attempting to recover fees incurred in

connection with its representation of Gens in the action against Ferrell and SEZ America, Inc. and

also in an earlier state court action. *See Hopkins & Carley v. Gens*, 200 Cal. App. 4th at 1406-09.

It appears that the litigation between H&C and Gens culminated in an order in 2011 by the a

California Court of Appeal affirming trial court orders that confirmed the June 5, 2007 arbitration

award in favor of H&C and awarded sanctions to H&C on the basis that Mr. Gens and his counsel

had filed a frivolous motion for relief from judgment.  *Id*. at 1417, 1419.

There is no evidence in the record as to whether the lien in the Patent Assignment and

License Back agreement has been discharged.

## 2.   Technology Claimed in the '863 Patent

The '863 Patent is entitled "Wafer Dryer and Method for Drying a Wafer."   The Abstract

describes the invention as "[a] wafer dryer and method featuring a nebulizer which emits a

pressurized drying liquid stream that converges with an opposed pressurized non-reactive carrier

gas stream to produce a drying liquid fog."   Claim 1 claims the following invention:

> 1.   A wafer dryer comprising:
>
> A wafer bath vessel having means for supporting at least one wafer
> having an exposed surface to be dried;
>
> And a tub mounted to the bath vessel, the tub having a drying liquid
> spray device and a non-reactive carrier gas spray device opposing
> the drying liquid spray device, the spray device emitting a stream of
> pressurized drying liquid that converges with a stream of opposed
> pressurized non-reactive carrier gas emitted by the spray device of
> pressurized non-reactive gas to produce a drying liquid fog, the tub
> also having means for venting the drying liquid fog into the wafer
> bath vessel, the drying liquid fog drying the wafer.

'863 Patent, Claim 1.  Claim 4 depends from claim 1 and claims "[t]he apparatus of claim 1

wherein said means for venting the drying liquid fog into the wafer bath vessel includes a port

disposed in said tub."  '863 Patent, Claim 4.

## C.   The Motion

In support of his request for entry of Default Judgment, Plaintiff filed an Application for

Default Judgment by Court ("Application") and a Memorandum in Support of Application for

United States District Court
Northern District of California

Default Judgment by Court ("Memorandum). Although the Application refers to an "accompanying declaration" by Mr. Gens, no declaration was filed prior to the November 20, 2015 hearing. However, when he appeared at the March 18, 2016 motion hearing, Mr. Gens swore under penalty of perjury that the facts set forth in the Application and Memorandum were true.

In the Application, Plaintiff states that: 1) Thomas is a male individual over the age of 55 who is a competent person and not in military service or otherwise exempted under the Soldiers and Sailor's Civil Relief Act; 2) Defendants were served personally at the residence of Defendant Thomas and by certified mail and that Thomas is the registered agent for service for Amerimade and Uptime; 3)   Plaintiff has had no contact with Defendants or their counsel since filing and serving this action; and 4) Plaintiff is entitled to judgment against Defendants "on account of the claims in the complaint further supported by the accompanying Gens Declaration." Application at 2.

In the Memorandum, Gens states that Thomas is a male individual over the age of 55 who is a competent person and not in military service or otherwise exempted under the Soldiers and Sailor's Civil Relief Act. Memorandum at 2. He further states that Defendants were served personally at the residence of Defendant Thomas and by certified mail and that Thomas is the registered agent for service for Amerimade and Uptime. *Id*. at 2-3. The Memorandum contains screen-shots of pages from the California Secretary of State website showing that Todd Thomas is the registered agent for service of process for "Amerimade Technology, Inc." and "Uptime Semiconductor Equipment Service, Inc." *Id*. The designated address for service for both entities is 449 Mountain Vista Parkway, Livermore California 94551. *Id*. The Memorandum also includes a screen-shot of a page from the California Secretary of State website showing the registered agent for service of process for "Amerimade Technology Inc." as Legalzoom.com, Inc. *Id*. According to Gens, Uptime and Amerimade were listed as "suspended" or "dissolved" by the California Secretary of State website at all times during the events recited in the FAC. *Id*. at 3. It was because the corporate status of Amerimade lapsed that a disgruntled service technician of Amerimade incorporated its name through LegalZoom in 2013, Gens states. *Id*. Gens states that Thomas was only able to recover the Amerimade name by paying the former employee, who then

United States District Court
Northern District of California

1   voluntarily dissolved his corporation.  *Id.*

2       Gens states in the Memorandum that Amerimade "is a defendant in at least 13 lawsuits

3   filed over the past few years in the Superior Courts for the Counties of Alameda, Santa Clara, San

4   Mateo, and Santa Cruz," and that several default judgments have been entered against it.  *Id.*

5       In the Memorandum, Gens also provides further factual information relating to specific

6   allegations in the FAC.  In connection with Paragraphs 10 and 11 of the FAC, relating to

7   Defendants' alleged patent infringement, Gens states that Defendants incorporated Venturi

8   Aerosol Maker ("VAM") components that he had provided to them under a non-disclosure and

9   licensing agreement into a piece of semiconductor processing equipment called a Dryer that

10  Defendants sold to SRI International in July 2013.  *Id.* at 3-4.

11      The non-disclosure and licensing agreement, entitled 2011 Mutual Confidentiality,

12  Nondisclosure and Licensing Agreement, is attached to the Memorandum as Exhibit A.  The

13  stated purpose of that agreement was to permit Gens and Amerimade to "explore a business

14  possibility of mutual interest" and in particular, "to exchange each others' Confidential

15  Information for the purposes of licensing, manufacturing, selling, supporting and/or purchasing

16  kits and/or complete systems which incorporate ChemAcoustics' aerosol drying technology into

17  Amerimade's product offering." Memorandum, Ex. A, Section 1.  Under the 2011 Mutual

18  Confidentiality, Nondisclosure and Licensing Agreement, the parties agreed to protect the

19  confidentiality of "Confidential Information," defined broadly as:

20          any information, technical data, or know-how considered proprietary
            or confidential by the Parties including, but not limited to,
21          specifications, designs, drawings, diagrams, engineering, marketing,
            techniques, mask works, documentation, customer information,
22          pricing information, procedures, data, concepts, business and
            marketing plans or strategies, financial information . . . in any form
23          whatsoever, including in writing, orally, machine readable form or
            by drawings or inspection of parts or equipment . . .
24

25  Memorandum, Ex. A, Sections 2 & 5.   In addition, the Confidential Information shared under the

26  agreement was to be returned promptly upon request or termination of the parties' business

27  relationship. *Id.*  Section 6.   Amerimade further agreed that it would pay Gens a licensing fee of

28  between $20,000 to $40,000 for each product sold by Amerimade to a third party that used his

United States District Court
Northern District of California

technology, with the rate depending on the "particle cleanliness specification" of the product. Memorandum, Ex. A, Section 8.

According to Gens, he is entitled to prejudgment interest starting from July 2013 and for treble damages on his patent infringement claim because Defendants' infringement was willful and deliberate. *Id*. at 4.

Gens also expands on the allegations in the FAC relating to the conversion claim, stating that while the parties had agreed that Defendants could use Gens's VAM components and drawings to make their own VAM components, Defendants instead used the actual VAM components Gens had provided to Amerimade in the Dryer that it sold to SRI. *Id*. These components are the subject of his conversion claim. *Id*. According to Gens, the manufacturing cost of each of the VAM components was $1200, with a retail value of $2400, giving rise to $4800 in value for the two lost VAM components. *Id*.

With respect to his request for attorneys' fees and costs in the FAC, Gens requests $400 for the filing fee in this case, $200 for service of process and $4000 in attorneys' fees, based on 40 hours of work by Gens, who is an attorney, at a rate of $100/hour.

### D.    The November 20, 2015 Hearing and the Supplemental Materials

At the November 20, 2015 Motion hearing, the Court asked Plaintiff to address numerous issues relating to his request for entry of default judgment, including his standing to assert a claim for patent infringement, the factual basis for his claims and his allegations of alter ego liability, and evidence supporting the amounts he requested in damages on his patent infringement and trade secret misappropriation claims. The Court also asked for additional information about the various state court cases related to Gens's ownership of the technology at issue in this case. Plaintiff addressed many of the Court's concerns in his Supplemental Declaration in Support of Application for Default Judgment ("Gens Supplemental Declaration" of "Gens Supp. Decl.").[4]

In the Gens Supplemental Declaration, Gens addresses his standing to pursue a patent

---

[4] Through a series of mishaps, the supplemental materials, which were due on December 18, 2015, were not filed until February 19, 2016, when the Court held a Show Cause hearing relating to the late submissions. Mr. Gens appeared in person with the requested materials and the Court expunged its Order to Show Case, finding that any neglect on Mr. Gens's part was excusable.

1   infringement claim on the '863 Patent, stating that he is the owner of that patent by virtue of the

2   assignment by SEZ AG in the Patent Assignment and License Back agreement, discussed above.

3   Gens Supp. Decl. ¶ 4 & Ex. A.

4         Gens also provides additional details relating to the nature of the trade secrets that are the

5   subject of his trade secret misappropriation and conversion claims, stating as follows:

6           Under the 2011 Mutual Confidentiality, Non-Disclosure and License
        Agreement ("2011 License") between Plaintiff and Amerimade . .

7           .Plaintiff delivered to Todd Thomas at Ameritrade drawings, Trade
        Secrets, and a complete, working Venturi Aerosol Maker (VAM)

8           which is the main component for the construction and operation of a
        Dryer in accordance with the '863 Patent.  The VAM was delivered

9           to Todd Thomas so that he could visualize what was disclosed in the
        drawings.  The VAM was to be returned to Plaintiff as its ownership

10          was not being transferred to Todd Thomas.  It is important to note
        that Amerimade was a corporation suspended at this time by the

11          Secretary of State in California.

12          . . .Todd Thomas constructed the Dryer using the Trade Secrets and
        the VAM owned by Plaintiff which he sold under the name of

13          Amerimade to SRI on the US east coast.  Plaintiff was told this
        directly by Todd Thomas as well as Mark Blaze, VP of Sales for

14          Amerimade, and several engineers employed by Todd Thomas and
        Amerimade.  The SRI Dryer with the VAM infringes the '863

15          Patent as it reads on each and every element of Device claims 1-14
        and each and every step of Method claims 15-22 recited in the '863

16          Patent. Todd Thomas and Amermade willfully converted the VAM
        owned by Plaintiff to build and sell the Dryer to SRI.

17

18  *Id*. ¶¶ 5-6.

19        In addition to the VAM Gens says he gave to Todd Thomas, Gens states that other Trade

20  Secrets provided to Todd Thomas were contained in "dozens of engineering drawings" that

21  illustrated "construction of the VAM with the critical sizing of the flow through holes in the

22  conical dispersing head."  *Id*. ¶ 9.  Sample pages are attached to the Gens Supplemental

23  Declaration as Exhibits B, C & D.  Gens further states that in 2014 he met with the CEO and two

24  VPs at a semiconductor manufacturer based in Fremont California, Kinetic System, which he

25  learned had entered into an agreement a few months earlier with Todd Thomas and Amerimade to

26  build semiconductor equipment like a Dryer for Amerimade.  *Id* ¶ 10.  According to Gens, he was

27  "surprised when they showed [him] copies of the exact same engineering drawings as the Exhibits

28  incorporating the Trade Secrets and more."  *Id*.  Gens states that Kinetic Systems "received these

United States District Court
Northern District of California

Trade Secrets directly from the hands of Todd Thomas and paid him compensation a few months earlier." *Id*. Kinetic Systems executives told Gens that a non-disclosure agreement prohibited them from disclosing the terms of their deal with Thomas. *Id*. Gens notes the 2011 Mutual Confidentiality, Non-Disclosure and License Agreement did not give Thomas or Amerimade the right to sublicense Gens's technology. *Id*. Gens states that the $40,000 licensing fee set forth in that agreement is a reasonable basis for determining a reasonable royalty as that rate was the product of negotiation between the parties.

On the question of alter-ego liability, Gens states that Amerimade is a "defendant in over a dozen state court cases in counties in the [B]ay area" involving "creditors that were defrauded of products and services by Todd Thomas" and that he has spoken to "more than five attorneys" who represent such creditors. *Id*. ¶ 7. According to Gens, "[o]n more than one occasion, a creditor served a lien on a customer owing to Amerimade. Todd Thomas would then cancel the invoice to that customer and instead issue an invoice [to the] same customer under the name of Defendant Uptime." *Id*. Gens states that he attended a deposition of Thomas in late 2014, taken as an examination of assets in one of the creditor lawsuits, in which Thomas testified that Amerimade and Uptime did not have any bank accounts. *Id*. ¶ 8. Nevertheless, Gens states, "Thomas is still doing business under the names Amerimade and Uptime." *Id*.

With respect to Gen's request for injunctive relief in his FAC, Gens states that he would like to drop that request and seek only damages, explaining that he will "enter into a separate agreement with Kinetic [Systems] to [avoid] future damages caused by Kinetic and Todd Thomas." *Id*. ¶ 12.

Finally, Gens cites to pages 18-26 of an expert report prepared for him in the state court action asserted by Gens against Ferrell and SEZ America, Inc., which he contends will provide guidance as to the amount of damages that are appropriate on the Trade Secret misappropriation claim. *Id*. ¶ 13 & Ex. E.

III.     ANALYSIS

   A.     Preliminary Considerations

          1.  Jurisdiction

          When entry of judgment is sought against a party who has failed to plead or otherwise

defend, a district court has the affirmative duty to determine whether it has jurisdiction.  *In re Tuli*,

172 F.3d 707, 712 (9th Cir. 1999).  The Court has subject matter jurisdiction over this action

because it is an action under federal law and relates to a patent. *See*  28 U.S.C. §§ 1331, 1338.  As

Defendants are alleged to reside and/or have their principal place of business in Livermore,

California, the Court also has personal jurisdiction.

          2.  Adequacy of Service

          Courts must determine the adequacy of service of process on a motion for default

judgment.  *Bank of the West v. RMA Lumber Inc.*, No. 07-6469 JSW, 2008 WL 2474650, at *2

(N.D. Cal. June 17, 2008).  Under Rule 4 of the Federal Rules of Civil Procedure, a party may

serve an individual or corporation "following state law for serving a summons in an action brought

in courts of general jurisdiction in the state where the district court is located or where service is

made." Fed. R. Civ. P. 4(e)(1); *see also* Fed. R. Civ. P. 4(h)(1)(A) (authorizing service of process

on corporations "in the manner prescribed by Rule 4(e)(1) for serving an individual").  Under

California law, "[a] summons may be served by personal delivery of a copy of the summons and

complaint to the person to be served."  Cal. Code Civ. Proc. § 415.10.  A summons can be served

on a corporation by delivering a copy of the summons and complaint to the person designated as

agent for service of process.  Cal. Code Civ. Proc. § 416.10(a).  Plaintiff has personally served the

complaint and amended complaint in this action on Todd Thomas, who is agent for service for

Amerimade and Uptime.  *See* Docket No. 8. Therefore, the undersigned finds that service of

process was adequate.

   B.     Legal Standard for Entry of Default Judgment

          After default has been entered against a party, a district court may grant an application for

default judgment in its discretion.  *See* Fed. R. Civ. P. 55(b)(2).  If the court is satisfied that

jurisdiction is proper and that service of process upon the defendant was adequate, it then

United States District Court
Northern District of California

considers several factors in determining whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471−72 (9th Cir. 1986).  In making its decision, the court takes all factual allegations in the complaint, except those relating to damages, as true.  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917−18 (9th Cir. 1987) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.").

### C.   *Eitel* Factors

As Defendants have not responded or answered Plaintiff's complaint, there is a danger that Plaintiff will be left without a remedy if the Court does not enter default judgment. Based on the allegations and evidence in the record, the magnitude of this harm is considerable given that the value of technology at issue appears to be in the tens – or even hundreds – of thousands of dollars. Further, there is nothing in the record that suggests that Defendants' failure to appear is due to excusable neglect.  Therefore, the Court turns to the sufficiency of Plaintiff's claims and the substantive merits of the case.  Each of Plaintiff's three claims is addressed below.

#### 1.  Patent Infringement

Pursuant to 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  Subsection (b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).

A plaintiff has standing to bring an action for patent infringement if the "party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury."  *WiAV Solutions LLC v. Motorola, Inc.*,

United States District Court
Northern District of California

631 F.3d 1257, 1265 (Fed. Cir. 2010). "Standing of the parties to bring their claims is a threshold matter that must be addressed before the substantive merits of the case." *Quantum Corp. v. Riverbed Tech., Inc.*, No. C 07-04161WHA, 2008 WL 314490, at *1 (N.D. Cal. Feb. 4, 2008). A patent owner has standing to sue for patent infringement, but if ownership of the patent is shared, all coowners must join in bringing a suit for patent infringement. *Int'l Bus. Machines Corp. v. Conner Peripherals, Inc.*, No. C 93 20591 RMW, 1994 WL 409493, at *3 (N.D. Cal. Jan. 28, 1994) (citing Chisum, Patents, § 21.03[3], 21–295; *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891)). Licensees have standing only if they are an exclusive licensee. *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) ("A nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement").

Here, Gens alleges that he is the owner of the '863 Patent and has offered evidence, in the form of the Patent Assignment and License Back agreement, that ownership of the '863 Patent was transferred to him in 2008. The Patent Act provides that "[a]pplications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing." 35 U.S.C. § 261. Therefore, as the assignee of the ownership rights in the '863 Patent, Gens has standing to pursue his claim for patent infringement. *See Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) ("if the patentee transfers all substantial rights under the patent, it amounts to an assignment and the assignee may be deemed the effective patentee under 35 U.S.C. § 281 for purposes of holding constitutional standing to sue another for patent infringement in its own name").

Further, although the assignment imposes a lien on Gen's rights, the Court concludes that that lien does not defeat Gens's standing to pursue a claim for infringement of the '863 Patent. Although the Court has not found a case that is directly on point, in *In re Cybernetic Services, Inc.*, the Ninth Circuit addressed a closely related issue, namely, whether the Patent Act requires that a holder of a security interest in a patent, such as a lien, must register that interest with the PTO under 35 U.S.C. § 261. 252 F.3d 1039 (9th Cir. 2001). The court concluded that § 261 applies only to ownership interests and that liens do not constitute an ownership interest under the

United States District Court
Northern District of California

Patent Act; on that basis, the court concluded that the Patent Act does not require registration of liens and further held that a state law requiring registration of liens therefore was not preempted by the Copyright Act.  252 F.3d at 1053-58.  Thus, the Court concludes that the lien in favor of H&C in the Patent Assignment and License Back agreement is not an ownership interest that deprives Gens of standing, even assuming the lien has not been discharged.

The Court also finds that Gens's claim that Defendants infringed the '863 Patent is adequately alleged and appears to have substantive merit.  In particular, he has alleged, and offered evidence, that Thomas, acting on his own behalf and as an alter-ego for Uptime and Amerimade, used the VAM that Gens made and on which the claims of the '863 Patent read, in a Dryer that he sold to SRI without authorization from Gens and without paying the licensing fee agreed to in the 2011 Mutual Confidentiality, Non-Disclosure and License Agreement.

In concluding that it is appropriate to "pierce the corporate veil" as to Amerimade and Uptime, the Court applies California law.  *See McRee v. Goldman*, No. 11-CV-00991-LHK, 2012 WL 929825, at *4 (N.D. Cal. Mar. 19, 2012) (holding that where a defendant is alleged to have infringed on the basis that a corporation acted as that defendant's alter ego, courts apply the law of the regional circuit).  In California, courts allow the corporate veil to be pierced "[o]nly when (1) there is such a unity of interest and ownership that the individuality, or separateness, of the said person and the corporation has ceased, and (2) an adherence to the fiction of the separate existence of the corporation would . . . sanction a fraud or promote injustice." *Id.* (citations and internal quotations omitted).  Gens has offered sufficient facts, both in the FAC and in his supporting declarations, to support a plausible inference that Uptime and Amerimade have no meaningful separate existence apart from Gens and that he has used the two entities to avoid creditors to advance his own personal interests. Amerimade and Uptime have not appeared in this action to challenge these facts and allegations.  Under these circumstance, the imposition of alter-ego liability is necessary to avoid injustice.[5]

---

[5] The Court's conclusion is not based on the fact that according to Gens, Amerimade and Uptime's corporate status was suspended during the time of all of the relevant events in this case.  The Ninth Circuit has made clear that under California law, the mere fact that corporate status is suspended does not give rise to alter ego liability where the elements of the test discussed above are not

For the reasons stated above, the Court concludes that entry of default judgment is appropriate as to all three defendants on Gens's claim for patent infringement.

### 2. Misappropriation of Trade Secrets Under CUTSA

In order to state a claim under the California Uniform Trade Secrets Act ("CUTSA"), a plaintiff must allege "facts sufficient to show 1) the existence of subject matter which is capable of protection as a trade secret; 2) that the secret was disclosed to the defendant under circumstances giving rise to an obligation not to use or disclose the secret to the detriment of the discloser; and 3) the defendant either used the trade secret or disclosed it to a third party." *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1112-13 (N.D. Cal. 2012) (citing *GlobeSpan, Inc. v. O'Neill*, 151 F.Supp.2d 1229, 1235 (C.D.Cal.2001)). "With respect to the first element, a trade secret is defined as 'a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value ... from not being generally known to the public; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *Solarbridge Techs., Inc. v. Ozkaynak*, No. C 10-CV-03769-EJD, 2012 WL 2150308, at *5 (N.D. Cal. June 12, 2012) (quoting CUTSA, Cal. Civil Code § 3426(d)). To state a claim for trade secret misappropriation, the plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade ... to permit the defendant to ascertain at least the boundaries within which the secret lies." *Id.* (quoting *Farhang v. Indian Inst. of Tech., Kharagpur*, No. C–08–2658, 2010 WL 2228936, at *13 (N.D.Cal.2010) (citing *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 253 (1968)). A plaintiff who prevails on a trade secret misappropriation claim may be entitled to damages and/or injunctive relief. *See* Cal. Civ. Code §§ 3426.2-3426.3.

Gens alleges that he derives economic value from the confidential information that is the subject of his misappropriation claim and that the information is not generally known or readily ascertainable, and that he used reasonable means to preserve the secrecy of the information, including providing the trade secrets to Defendants under a nondisclosure agreement. *See* FAC ¶

satisfied. *See United States v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774, 775 (9th Cir. 1977).

14-15.  He further alleges Defendants used the trade secrets in a manner that violated the 2011 Mutual Confidentiality, Non-Disclosure and License Agreement by "selling and transferring the trade secrets to SRI and Kinetic Inc.  FAC ¶ 16.  In addition to the allegations, Gens has provided additional details and documentation in support of his trade secret misappropriation claim.  At the Motion hearing, he explained that the alleged trade secrets were not merely the technology claimed in the '863 Patent but instead, proprietary information showing how this technology could be incorporated into an actual Dryer.  He stated that the trade secrets were conveyed in the form of a fully constructed VAM, as well as engineering drawing, which he provided to Todd Thomas, under the 2011 Mutual Confidentiality, Nondisclosure and License Agreement, to assist him in constructing his own Dryer.  He has also provided the 2011 Mutual Confidentiality, Nondisclosure and License Agreement.  Memorandum, Ex. A. And in his Supplemental Declaration, Gens offers additional details about the information that he claims is proprietary trade secret information.  *See* Gens Supp. Decl. ¶ 9.

Based on the allegations in the FAC and the supplemental materials, the Court concludes that the claim for misappropriation of trade secrets is adequately alleged and appears to have substantive merit.  For the reasons stated above, the Court also finds that Plaintiff has adequately alleged that Thomas is an alter ego for Defendants Uptime and Amerimade.  Therefore, the Court recommends that default judgment be granted as to the trade secret misappropriation claim.

### 3.  Conversion

Under California law, conversion refers to "an actual interference with [the plaintiff's] ownership or right of possession."  *Moore v. Regents of Univ. of Cal.*, 51 Cal. 3d 120, 136 (1990).  To establish a claim of conversion, the plaintiff must show "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3) damages."  *In re Emery*, 317 F.3d 1064, 1069 (9th Cir. 2003) (citing *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1065 (1998)).  The statute of limitations for conversion is three years.  *See* Cal. Code Civ. Proc. § 338(c)(1).  Courts in this district have concluded that a common law claim for conversion is preempted by CUTSA if the claim is based on the same nucleus of facts as a claim for misappropriation of trade secrets.  *See Language Line*

United States District Court
Northern District of California

17

1    *Servs., Inc. v. Language Servs. Associates, Inc.*, 944 F. Supp. 2d 775, 780-781 (N.D. Cal. 2013)

2    (Seeborg, J.) (reviewing cases).

3          Gens's conversion claim is based on allegations that Defendants did not return

4    "semiconductor parts" that were provided for demonstration purposes only and not for resale

5    under the Nondisclosure Agreement and the License Agreement. Based on the supplemental

6    materials provided by Gens, it is clear that the semiconductor parts that Thomas allegedly failed to

7    return are the components that Gens contends contained trade secrets.  Because the conversion

8    claim is encompassed in the CUTSA claim, the Court concludes that it is preempted.

9          Accordingly, the Court recommends that default judgment be denied as to the conversion

10   claim.  *See HTS, Inc. v. Boley*, 954 F. Supp. 2d 927, 945 n. 5 (D. Ariz. 2013) ("The Court cannot

11   enter default judgment on preempted claims because such claims contain no cause of action that

12   could have proceeded to trial, and thus, contain no cause of action upon which the Court could

13   enter judgment") (citations and quotations omitted).

14   **D.     Remedy**

15         Having found that Plaintiff is entitled to entry of default judgment on his claims for patent

16   infringement and misappropriation of trade secrets, the Court now turns to the appropriate remedy.

17   Plaintiff has requested the Court award the following remedies:  1) treble damages on his claim for

18   patent infringement, in the amount of $120,000; 2) unspecified damages on his trade secret

19   misappropriation claim; 3) prejudgment interest; and 4) an award of attorneys' fees; and 5) costs

20   in the amount of $600.  The Court addresses each of these remedies below.

21               **1.   Damages on Claim for Patent Infringement**

22         Under the Patent Act, a plaintiff who prevails on a claim for infringement is entitled to

23   "damages adequate to compensate for the infringement, but in no event less than a reasonable

24   royalty for the use made of the invention by the infringer, together with interest and costs as fixed

25   by the court." 35 U.S.C.A. § 284.  Further, the court has discretion to award enhanced damages for

26   infringement "up to three times the amount found or assessed." *Id.*; *Read Corp. v. Portec, Inc.*,

27   970 F.2d 816, 826 (Fed.Cir.1992), abrogated on other grounds by *Markman v. Westview*

28   *Instruments, Inc.*, 52 F.3d 967, 975 (Fed.Cir.1995) (en banc).   To determine whether

United States District Court
Northern District of California

1    enhancement is appropriate, courts look to the totality of circumstances and consider the

2    egregiousness of the defendant's conduct as well as mitigating factors.  *Read*, 970 F.2d at 826;

3    *Rite–Hite Corp. v. Kelley Co*., 819 F.2d 1120, 1125–26 (Fed.Cir.1987).  Factors that may be

4    considered on enhancement are:

> (1) whether the infringer deliberately copied the ideas or design of
> another;(2) whether the infringer, when he knew of the other's patent
> protection, investigated the scope of the patent and formed a good-
> faith belief that it was invalid or that it was not infringed;(3) the
> infringer's behavior as a party to the litigation;(4) Defendant's size
> and financial condition;(5) Closeness of the case;(6) Duration of
> defendant's misconduct;(7) Remedial action by the defendant;(8)
> Defendant's motivation for harm;(9) Whether defendant attempted to
> conceal its misconduct.

10   *Read*, 970 F.2d at 827. "Inasmuch as a finding of willful infringement does not mandate

11   enhancement of damages, the above factors taken together assist the trial court in evaluating the

12   degree of the infringer's culpability and in determining whether to exercise its discretion to award

13   enhanced damages and how much the damages should be increased." *Id*. at 828.

14        Gens has offered evidence of the reasonable royalty for Defendants' use of his patented

15   technology, in the form of the 2011 Mutual Confidentiality, Nondisclosure and Licensing

16   Agreement, setting forth licensing fees for the sale that would be paid to Gens for sales of Dryers

17   by Amerimade that incorporated his technology.  *See Veritas Operating Corp. v. Microsoft Corp*.,

18   No. 2:06-CV-00703-JCC, 2008 WL 657936, at *5 n. 2 (W.D. Wash. Jan. 17, 2008) adopted, No.

19   C06-0703-JCC, 2008 WL 687116 (W.D. Wash. Mar. 11, 2008) (holding that one measure of a

20   reasonable royalty on a patent infringement claim is "[t]he amount that a licensor (such as the

21   patentee) and a licensee (such as the infringer) would have agreed upon (at the time the

22   infringement began) if both had been reasonably and voluntarily trying to reach an agreement").

23   That agreement sets forth three possible licensing fees – $20,00, $30,00 or $40,000 – depending on

24   the cleanliness specification of the product sold by Ameritime.   Memorandum, Ex. A, Section 8.

25   These fees were to be "per VAM" in a product.  *Id*.

26        The Court concludes that one of the amounts listed in the 2011 Mutual Confidentiality,

27   Nondisclosure and Licensing Agreement should be used to calculate Gen's reasonable royalty.

28   Gens has not, however, offered any evidence as to the "cleanliness specification guarantee"

United States District Court
Northern District of California

associated with the product sold to SRI.   In the Gens Supplemental Declaration, however, he

states that a single VAM was delivered to Thomas and used in the Dryer sold to SRI.  Gens Supp.

Decl.  ¶ 9.  In the absence of evidence regarding the cleanliness specification guarantee of the

VAM that was used in the Dryer sold to SRI, the Court uses the lowest licensing fee specified in

the agreement, $20,000.  The Court relies on Gens's representation in the Supplemental

Declaration that a single infringing VAM was used in the Dryer that was sold to SRI.

Next, the Court addresses whether Plaintiff is entitled to an enhancement of damages.  The

Court concludes that he is.  According to the allegations and supporting declarations supplied by

Gens, it appears that Defendants were fully aware of Gens's patent rights, that they knowingly and

willfully infringed on them, and that they did so without any good faith basis for believing  their

conduct was lawful.  They then made it difficult for Gens to vindicate his rights under the Patent

Act by failing to appear in this action after being properly served.  Among other things, by failing

to appear, Defendants deprived Gens of the opportunity to conduct discovery that would have

allowed him to determine more accurately the full extent of his damages.  Under these

circumstances, the Court concludes that Gens's damages should be trebled, that is, that he should

be awarded $60,000 on his claim for patent infringement.

### 2.  Damages on Trade Secret Misappropriation Claim

Under CUTSA, a prevailing plaintiff may "recover damages for the actual loss caused by

misappropriation" and "also may recover for the unjust enrichment caused by misappropriation

that is not taken into account in computing damages for actual loss."  Cal. Civ. Code § 3426.3.

Alternatively, "[i]f neither damages nor unjust enrichment caused by misappropriation are

provable, the court may order payment of a reasonable royalty for no longer than the period of

time the use could have been prohibited."  *Id.*

According to Gens, the VAM components he delivered to Thomas and that contain his

trade secrets have a retail value of $4800. Application ¶ 4C.  The Court concludes that this amount

should be awarded as actual damages on his trade secret misappropriation claim.  Gens has failed

to establish any further actual damages, however.  The only evidence offered is an expert report

that is ten years old and Gens has not explained how it has any bearing on the conduct at issue in

United States District Court
Northern District of California

this case.  Nor has he offered any evidence establishing the amount by which Defendants were unjustly enriched as the result of their misappropriation of Gens's trade secrets.  Finally, to the extent that a reasonable royalty might be available on Plaintiff's trade secret misappropriation claim, the Court concludes that such damages would likely duplicate the damages awarded on the patent infringement claim.  Therefore, it is recommended that Gens be awarded $4,800 in compensatory damages on the trade secret misappropriation claim.

### 3.  Prejudgment Interest

Gens has requested an award of prejudgment interest on his patent infringement damages starting in July 2013, when Defendants allegedly sent the infringing Dryer to SRI.  *See* Application at 4.  The Supreme Court has held that prejudgment interest should ordinarily be awarded under the Patent Act, noting that "[a]n award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56 (1983);  *see also* 35 U.S.C. § 284.   In cases where the court awards treble damages as a punitive measure, prejudgment interest is calculated based only on the compensatory portion of the damages award and not on the enhanced damages. *See Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1580 (Fed. Cir. 1991).

District courts have some discretion in deciding the appropriate rate to be used in calculating prejudgment interest, as well as whether to apply a simple or compound rate of interest.  *See Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (recognizing district court's discretion in determining appropriate rate of prejudgment interest and whether to award compound interest); *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 557 (Fed.Cir.1984) (noting that "the determination whether to award simple or compound interest similarly is a matter largely within the discretion of the district court," and that both simple and compound interest awards have been upheld). Courts often use the 52-week Treasury bill rate, but a higher rate of interest may be used if  the plaintiff shows that it borrowed money at a higher rate and that "'there was a causal connection between any borrowing and the loss of the use of the

1  money awarded as a result of [the defendant's] infringement.'" *Apple, Inc. v. Samsung Elecs. Co.*,

2  926 F. Supp. 2d 1100, 1107 (N.D. Cal. 2013) vacated on other grounds and remanded, 786 F.3d

3  983 (Fed. Cir. 2015) (quoting *Laitram Corp.*, 115 F.3d at 955 (Fed.Cir.1997)).

4      Based on the principles set forth above, it is recommended that the Court award $360 in

5  prejudgment interest, which is calculated based on the $20,000 in compensatory damages that is

6  the basis for the damages award on the patent infringement claim, using the most recently

7  published 52-week Treasury bill rate of .67 percent, for the period August 1, 2013 to April 1,

8  2016, compounded annually.[6] *See Saavedra v. Korean Air Lines Co.*, 93 F.3d 547, 555 (9th Cir.

9  1996) (acknowledging that while the most accurate way to calculate prejudgment interest would

10  be to use the fluctuating T-bill rate but that it is within the district court's discretion to use the rate

11  just before the time of judgment).

12      **4.  Attorneys' Fees**

13      Under the Patent Act, "[t]he court in exceptional cases may award reasonable attorney fees

14  to the prevailing party." 35 U.S.C.A. § 285.  Plaintiff has cited no authority, however, that

15  supports the conclusion that an attorney representing himself may recover attorneys' fees under

16  the Patent Act.  Nor has the undersigned found any such authority. In general, courts have found

17  that  pro se litigants cannot recover attorneys' fees, even if they are attorneys, because "the usual

18  and ordinary meaning of the words 'attorney's fees,' both in legal and in general usage, is the

19  consideration that a litigant actually pays or becomes liable to pay in exchange for legal

20  representation."  *Trope v. Katz*, 11 Cal. 4th 274, 280 (1995).  An attorney litigant who represents

21  himself pays no such compensation and therefore is not eligible for attorneys' fees.  *Id.*

22  Therefore, the Court concludes that Plaintiff is not entitled to an award of attorneys' fees.

23      **5.  Costs**

24      Plaintiff has incurred costs in the amount of $600, which consists of the $400 filing fee in

25  this case and $200 for service of process.  Application ¶ 4D.  Under Rule 54(d) of the Federal

27  [6] The Court recommends starting the calculation on August 1, 2013 because Gens did not provide the exact date in July when Defendants sent the infringing Dryer to SRA. It has calculated prejudgment interest out to April 1, 2016 for simplicity and with the expectation that Plaintiff will likely receive a copy of the Court's Report and Recommendations around that date.

1   Rules of Civil Procedure and Civil Local Rule 54-3(a), he is entitled to an award of these costs on

2   the basis  that he is the prevailing party in this action.

3   **IV.     CONCLUSION**

4           For the reasons stated above, it is recommended that the Motion be GRANTED in part and

5   DENIED in part.  In particular, the undersigned recommends that default judgment be entered as

6   to all three Defendants on Plaintiff's claims for patent infringement and trade secret

7   misappropriation.  The claim for conversion should be dismissed with prejudice on the basis that it

8   is preempted by the CUTSA claim. It is further recommended that the Court award: 1) $60,000 in

9   damages on the patent infringement claim, which includes $20,000 in compensatory damages and

10  $40,000 in enhanced damages; 2) $360 in prejudgment interest on the patent compensatory

11  damages; 3) $4,800 in damages on the trade secret misappropriation claim; and 4) $600 in costs,

12  for which Defendants should be held jointly and severally liable. Pursuant to Rule 72 of the

13  Federal Rules of Civil Procedure, Plaintiff must file any objection to these recommendations

14  within 14 days of receiving a copy of this Report & Recommendations.

15

16  Dated: March 21, 2016

17

18  _____

19  JOSEPH C. SPERO
    Chief Magistrate Judge

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California